**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHARLES MITCHELL, Plaintiff** | |
| **v.** | **CIVIL ACTION** |
| **KENSINGTON COMMUNITY CORPORATION FOR INDIVIDUAL DIGNITY, Defendant.** | **NO. 18-2869** |

Baylson, J.                                                              November 26, 2019

## I.    INTRODUCTION

In this employment discrimination case, Charles Mitchell ("Plaintiff") alleges that Kensington Community Corporation for Individual Dignity ("KenCCID") violated the Americans with Disabilities Act ("ADA") by failing to accommodate him, retaliating against him, and discriminating against him; and violated Title VII of the Civil Rights Act of 1964 by subjecting him to retaliation, discrimination, and a hostile work environment based on his national origin (African American).  Presently before the Court is KenCCID's Motion for Summary Judgment. For the reasons that follow, KenCCID's Motion will be granted in part and denied in part.

## II.    MATERIAL FACTS

The following is a fair account of the factual assertions, as taken from both parties' Statement of Facts and briefs.

### A.  Plaintiff's Employment with KenCCID

Plaintiff, an African American born in the United States, spent twenty-five years working for Defendant KenCCID.  KenCCID operates homes known as Community Living Arrangements ("CLAs") that provide in-home services to individuals with intellectual, physical, and psychiatric disabilities.  (ECF 21, Def. Mot. for Summ. J., Ex. A. Warrakah-Ali. Decl. ¶ 2 ("Warrakah-Ali Decl.").)  Although Plaintiff's specific role and job title varied, he worked in KenCCID's

Maintenance department for the entirety of his employment. (Id. ¶ 6.) Plaintiff's general responsibilities included basic maintenance tasks (i.e., snow removal, painting, and simple repairs); submission of reports regarding the status of maintenance projects; and hiring of external contractors when necessary. (Id. ¶ 7.)

According to Maku Warrakah-Ali ("Warrakah-Ali"), CEO of KenCCID, Plaintiff's job titles included: Maintenance Worker (1994); Maintenance Technician (1997); Maintenance and Vehicle Coordinator (2008); Maintenance Director (2010);[1] and Maintenance Coordinator (2014 until 2018 resignation). (Id.) None of these roles involved Plaintiff supervising other KenCCID employees; Plaintiff's supervisory authority was limited to temporary contractors. (Id. ¶ 10.)

Plaintiff's direct supervisor changed during the years that he was employed by KenCCID. Warrakah-Ali supervised Plaintiff from 2003 until late 2014, at which time Francis Sivieri ("Sivieri") took over supervision of Plaintiff. (Id. ¶ 8.) On December 31, 2016, Glenn DeShields ("DeShields"),[2] hired as the Director of Human Resources, assumed responsibility for supervising the employees of KenCCID's Maintenance department, including Plaintiff. (Id.) After DeShields left KenCCID's employ in July 2017, Warrakah-Ali resumed ultimate supervision of the Maintenance department. (Id. ¶ 26.) Warrakah-Ali, Sivieri, and DeShields were all members of KenCCID's executive staff. (Id. ¶ 8.)

### B. Restructuring of KenCCID's Maintenance Department

In 2014, KenCCID restructured its Maintenance department to create an additional Maintenance Coordinator position. (Id. ¶ 13.) This spot was filled by Lionel Labitan ("Labitan"),

---

[1] Warrakah-Ali explained that the change in Plaintiff's job title to Maintenance Director was solely intended to give him the appearance of decisionmaking authority when "negotiating with contractors to perform specialized work." (Id. ¶ 11.) Warrakah-Ali explained that "[d]espite th[e] change in title, I did not alter [Plaintiff's] job responsibilities or pay nor did I provide him with the authority to retain any contractor or make significant purchasers without my authority." (Id.)

[2] The Court notes that the transcript from Plaintiff's deposition spelled DeShields' name "Glenda Shields." Because both parties spell the name "Glenn DeShields" in their briefing, the Court will use that spelling.

a native of Benin, Africa who, at the time of his promotion to the Maintenance department, worked for KenCCID in an entry-level position. (Id.) Friction between Plaintiff and Labitan surfaced almost immediately. Labitan sought out Warrakah-Ali to inquire about whether Plaintiff had supervisory authority over him, because Labitan reported that Plaintiff was giving him less desirable jobs. (Id. ¶ 15.) Warrakah-Ali clarified that Plaintiff and Labitan were equals, and that Plaintiff did not have supervisory authority. (Id.)

The next year, in 2015, KenCCID hired a third Maintenance Coordinator, Ron Philips ("Philips"), an African American born in the United States. (Id. ¶ 16.) Plaintiff reported that he generally did not have problems with Philips, because an "understanding" existed between the two men. (Def. Mot. for Summ. J., Ex. B Pl. Dep. 75:19 ("Pl. Dep.").) During the time when Plaintiff, Labitan, and Philips were employed as KenCCID's three Maintenance Coordinators, Sivieri reported "frequent bickering" in the department. (Warrakah-Ali Decl. ¶ 17.)

The Maintenance department discord resulted in Warrakah-Ali's decision to temporarily change Plaintiff's position title to "Lead Maintenance Coordinator." (Id. ¶ 20.) Warrakah-Ali discussed the proposed change with Plaintiff and Sivieri, and informed Plaintiff that because the change would be made only after it was explained to the entire Maintenance department, he was to keep the information confidential. (Id.) According to Warrakah-Ali, "within hours of th[e] meeting," Plaintiff leaked information about the promotion to several other KenCCID personnel. (Id.) Plaintiff's inability to maintain confidentiality led to the revocation of the title change. (Id.)

### C. Creation of Maintenance Supervisor Position

The unresolved Maintenance department turmoil prompted Warrakah-Ali to authorize the creation of a Maintenance Supervisor position in early 2016. (Id. ¶ 17.) The purpose of the position was to resolve disputes, ensure jobs were distributed fairly, and complete specialized

assignments.  (Id.)  The Maintenance Supervisor would be tasked with distributing the maintenance jobs and ensuring that they were timely completed.  (Id. ¶ 25.)  DeShields—the Director of Human Resources—was tasked with filling the position, but he supervised the Maintenance department until a hire was made.  (Id. ¶ 18.)  The Maintenance Supervisor position remained unfilled for approximately one year.  (Id.)  Sivieri reported to Warrakah-Ali that during this time, the tension in the Maintenance department increased, because Plaintiff felt he deserved the promotion due to his seniority.  (Id. ¶ 19.)

KenCCID promoted Labitan to the position of Maintenance Supervisor, effective January 15, 2017.  (Id. ¶ 24.)  Because all of Plaintiff's previous supervisors had been on KenCCID's executive team, this was the first time that Plaintiff was supervised by another Maintenance department member.  (Id.)  Although DeShields retained supervisory authority over the entire Maintenance department, Labitan's promotion to Maintenance Supervisor meant that Plaintiff would report directly to Labitan.  (Id. ¶ 9.)

### D.  Plaintiff's Interactions with Labitan

Friction between Plaintiff and Labitan developed soon after Labitan started in the Maintenance department.  The disagreements between Plaintiff and Labitan revolved around at least three topics: Labitan's offensive comments about African American people; Plaintiff's perception that Labitan and another Maintenance department employee talked negatively about him in French so he could not understand what they were saying; and work-related disputes about the quality of both Plaintiff's and Labitan's performance.

First, in his deposition, Plaintiff explained that "from almost the beginning of when" Labitan started working for the Maintenance department, Labitan made derogatory comments about "black people [who were] born in this nation."  (Pl. Dep. 76:15; 76:5.)  Plaintiff explained

that Labitan made these comments during "general conversation[s]" about "life and women." (Id. 79:18; 79:20.)

A sampling of the comments that Labitan made to Plaintiff include:[3]

- "Black people are lazy and they have welfare." (Id. 76:19-20.)

- "[African American] women are only used, good for play things." (Id. 76:22-23.)

- "All [African American people] like to do is do drugs, stay on the corner and smoke blunts." (Id.76:25; 77:2.)

- "[African American people] don't do nothing but sit on corners, drink beer and smoke weed." (Id. 80:23-24.)

- "[American] black people don't utilize the free education, and all they do is sit on street corners and drink beer and smoke dope and be drug dealers." (Id. 81:22-25.)

Second, Plaintiff discussed the offense he took to conversations that were conducted in French by Labitan and Gildes Sewa, another native of Africa who worked in KenCCID's Maintenance department. According to Plaintiff, Labitan and Benin "talk[ed] about [Plaintiff] behind, when [he was] there in their language and they laugh[ed] and snickle [sic] and gigs [sic]." (Id. 83:15-17.) Plaintiff inferred that he was the subject of their conversations because he can "read body language" and "ha[s] common sense." (Id. 85:19.)

Third, Plaintiff and Labitan disagreed about the quality of Plaintiff's performance at work. According to Plaintiff, Labitan repeatedly criticized Plaintiff's job performance, telling him he was "lazy;" "[n]o good;" and did not "know what [he was] doing." (Id. 109:6.) Plaintiff regularly reported Labitan's critiques of Plaintiff's work-related performance to management. (Id. 102:22-

---

[3] In his deposition, Labitan denied making each of these statements. See ECF 24, Pl. Opp'n Ex. C Labitan Dep. 11:22-24; 12:1-8 ("Labitan Dep.").

25.)  Plaintiff's anger at Labitan's criticisms was aggravated by his perception that Labitan came to work late and did not listen to Plaintiff's direction.  (Id. 106:9-10.)

### E.  Other Incidents Involving KenCCID Maintenance Department Employees

In addition to the specific comments Labitan made, there were various incidents involving the employees of the Maintenance department that prompted Plaintiff to file reports of the perceived discrimination with KenCCID management.

First, on March 14, 2016, an incident occurred involving Plaintiff, Philips, and Labitan at the local Lowe's hardware store.  According to Plaintiff, after he provided an instruction to Philips and Labitan, Philips and Labitan told a Lowe's employee that Plaintiff "ain't nobody but the Uber driver."  (Pl. Dep. 62:22.)  Plaintiff felt disrespected by the implication that he had no authority over Philips and Labitan, so he filed an Incident Report documenting the interaction with KenCCID.  (Id. Ex. 7.)

Second, some time in March 2016, an incident occurred involving a dispute between Philips and Plaintiff.  The nature of the disagreement is not clear from the record, but during his deposition, Sivieri testified that it was brought to his attention that both Philips and Plaintiff had firearms.  (Def. Mot. for Summ. J., Ex. D Sivieri Dep. 17:17-20 ("Sivieri Dep.").)  Neither firearm was used or brandished, but the incident resulted in a new human resources policy.  (Id. 17:14-20; 18:1-7.)

### F.  Reports of Discrimination to Management

During his deposition, Plaintiff was emphatic that he "complained about [his disagreements with Labitan] basically the whole time [Labitan] was there in the maintenance department."  (Pl. Dep. 106:20-22.)  The record is ambiguous on whether Plaintiff notified management not only of the friction between him and Labitan, but also of Labitan's  discriminatory, harassing remarks.

### 1. Plaintiff's Recollection of Reporting Discrimination to Management

During his deposition, Plaintiff was asked whether he "document[ed] [Labitan's] comments [about black African Americans] anywhere." (Id. 91:3-4.) In response, Plaintiff answered that he "may have told [his] supervisor, [Frank Sivieri]" but that he was "not sure." (Pl. Dep. 91:5; 91:7; 91:9.) Plaintiff also acknowledged that he did not take any disciplinary action against Labitan for the discriminatory comments—according to Plaintiff, the "[o]nly disciplinary actions [he] tried to get taken against Mr. Labitan [were] when he never showed up [to] work on time." (Id. 92:18-21.)

Later in his deposition, Plaintiff clarified that he did write an incident report documenting Labitan's offensive remarks, but that he could not remember who he gave it to. (Id. 98:9-24.) According to Plaintiff, Labitan's offensive comments continued after Labitan's promotion to the Maintenance Supervisor position. Plaintiff recalled submitting an incident report regarding Labitan's behavior to DeShields, who was transitioning Labitan into his new role. (Id. 100:2-20.) However, Plaintiff could not "specifically remember" if he reported Labitan's racially derogatory remarks about African Americans to his supervisor. (Id. 101:9-20.)

### 2. Management Recollections of Plaintiff's Reports of Discrimination

Of the three KenCCID executive team employees who supervised Plaintiff—Warrakah-Ali, Sivieri, and DeShields—neither Warrakah-Ali nor DeShields recall Plaintiff bringing their attention to Labitan's allegedly harassing remarks. Sivieri was generally aware of reports of dissension in the Maintenance department but could not recall specific comments that Plaintiff brought to his attention.

**Warrakah-Ali**, CEO of KenCCID, confirmed that Plaintiff never "complain[ed] to [her] that Mr. Labitan had made derogatory remarks about African Americans born in America."

(Warrakah-Ali Decl. ¶ 26.)  During her deposition, Warrakah-Ali further explained her recollection that Sivieri characterized the disagreements between Labitan and Plaintiff as bickering "about [Plaintiff] wanting to be supervisor because he [had] been there longer."  (Pl. Opp'n Ex. B Warrakah-Ali Dep. 16:23-24 ("Warrakah-Ali Dep").)  Warrakah-Ali noted that Sivieri had never mentioned racial comments that were exchanged between Plaintiff and Labitan, (id. 17:13-16), and that to her knowledge, Labitan was never antagonistic toward or disrespectful to Plaintiff.  (Id. 26:10:16.)  However, in response to an email dated March 16, 2016 written by Sivieri describing how Plaintiff was "in [Sivieri's] office this afternoon claiming harassment by both Ron Phillips [sic] and Lionel Labitan," Warrakah-Ali stated that "[t]hese are serious accusations by [Plaintiff]." (Sivieri Dep. Ex. P-1.)

    **DeShields**, KenCCID's Director of Human Resources at the time that Labitan was promoted to Maintenance Supervisor, corroborated Warrakah-Ali's opinion that the animosity between Plaintiff and Labitan stemmed from Labitan's supervisory authority.  DeShields recited that the relationship between Labitan and Plaintiff "was tenuous … because [Plaintiff] had never been supervised by a maintenance person previously, and … did not take supervision well from [Labitan]."  (Def. Mot. for Summ. J., Ex. E DeShields Dep. 10:1-5 ("DeShields Dep.").) DeShields recalled that Plaintiff reported an "issue with the truck that [Labitan] was driving" and that his primary complaint was that he wanted to drive the truck.  (Id. 10:21-24.)  In response to a question about whether Plaintiff ever talked to DeShields about the disrespect that he was experiencing, DeShields answered that Plaintiff "said he didn't like the way [Labitan] would supervise him" and, more specifically, that Plaintiff did not like anyone checking on him.  (Id. 13:4-12.)  DeShields explained that "[t]he only racial comment" he was aware of involving

Plaintiff and Labitan was Plaintiff's statement that "I heard we hired another African" after KenCCID hired Sewa. (Id. 20:9; 20:13-14.)

**Sivieri**, the KenCCID Fiscal Director, opined that the tension between Plaintiff and Labitan arose because Plaintiff felt disrespected. (Sivieri Dep. 7:17; 12:16.) Sivieri explained that Plaintiff felt disrespected "because of his tenure," as he had been employed by KenCCID for many years. (Id. 12:21-22.) Sivieri testified that he recalled discussions with the three Maintenance department employees concerning the racially derogatory names that were used, and that this led to conversations with human resources in an attempt to identify a solution. (Id. 15:15-24; 16:1-15.) Although Sivieri could not recall a precise instance in which Plaintiff complained of the disrespect he experienced, he noted that he did "hear … how [Plaintiff] felt." (Id. 19:21.) During Sivieri's deposition, an email written by him dated March 16, 2016 was referenced, in which he stated that Plaintiff "was in [Sivieri's] office this afternoon claiming harassment by both Ron Phillips [sic] and Lionel Labitan." (Id. Ex. P-1.) According to a subsequent record created by Sivieri, a meeting was held with Plaintiff, Labitan, Philips, Sivieri, and various human resources employees on March 29, 2016 to discuss "a lack of respect and verbal sparring which [Plaintiff] received since [KenCCID's] restructuring." (Id. Ex. P-2.)

### G. Plaintiff's Resignation

Plaintiff decided to resign from KenCCID because he was "fed up" with the strife in the Maintenance department. (Pl. Dep. 22:5.) During his deposition, Plaintiff explained that he had no choice but to leave the employ of KenCCID because if he stayed he might have felt compelled to resort to violence and physicality. (Id. 20:20-22.) In particular, Plaintiff expressed concern that if he stayed on the job, he felt he "was going to head to jail because [he] was going to hit [Labitan] in the head with a shovel." (Id. 165:16-18.) To avoid putting himself in a position where he would

be unable to control his anger, Plaintiff decided to "walk[] off a job [he had held] for 26 years." (Id. 165:24.) Although Plaintiff knew his resignation would cause him to lose back pay and medical benefits, he felt leaving KenCCID's employ was his only option. (Id. 166:2-7.)

Plaintiff officially communicated his resignation via electronic message sent on January 11, 2018 to Warrakah-Ali, another Human Resources representative, Labitan, and Sivieri. (Pl. Dep. Ex. 10.) In the message, Plaintiff stated that his decision to resign was motivated by the "very stressful and unhealthy" nature of the job, prompted by the fact that his "current supervisor [Labitan] was once under [Plaintiff] and currently harasses belittle[s] and disrespects every chance he can get." (Id.)

At the time Plaintiff left the employ of KenCCID, he had another job as a truck driver waiting for him. (Pl. Dep. 21:5-12.) According to Warrakah-Ali, Plaintiff wanted to be a truck driver "for many, many years, as long as [she] kn[ew] him at KenCCID." (Warrakah-Ali Dep. 21: 9-11.) In Warrakah-Ali's opinion, Plaintiff resigned from KenCCID "because he succeeded in his truck driving certification" and finally decided to pursue his long-time passion. (Id. 20:19-20.)

## III. PROCEDURAL HISTORY

Plaintiff filed a Charge of Discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), which was dismissed on June 11, 2018 upon a finding that the EEOC was "unable to conclude that the information obtained establishes violations of the statutes." (Attachment to ECF 1.) Plaintiff then filed his Complaint in this Court on July 9, 2018, alleging two counts: (I) violations of Title VII (based on national origin discrimination, hostile work environment, and retaliation); and (II) violations of the ADA (based on discrimination, failure to accommodate, and retaliation). (ECF 1.) KenCCID filed an answer to Plaintiff's Complaint on September 23, 2018. (ECF 7.) KenCCID filed a motion for summary judgment—

its first dispositive motion in this litigation—on April 30, 2019.  (ECF 21.)  On May 23, 2019, Plaintiff responded in opposition and provided its own statement of undisputed facts.  (ECF 24.)  In accordance with the Court's standing orders, Plaintiff filed an enumerated response to KenCCID's statement of undisputed facts on September 12, 2019.  (ECF 26.)  On September 18, 2019, KenCCID also responded to Plaintiff's statement of undisputed facts.  (ECF 27.)

## IV.  LEGAL STANDARD

Summary judgment is proper if the movant can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a fact "might affect the outcome of the suit under the governing law," the factual dispute is material and will allow the nonmovant to survive summary judgment.  Id.  Only if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party" is a grant of summary judgment appropriate.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the district court is obligated to "review the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor."  In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015).

It is the responsibility of the litigant seeking summary judgment to inform the district court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the burden of proof on a particular issue rests with the nonmoving party at trial, the moving party's initial burden can be met by simply "pointing out to the district court that there is an absence of

evidence to support the nonmoving party's case." Id. at 325. Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute. FED. R. CIV. P. 56(c).

## V.  DISCUSSION

Plaintiff's Complaint asserts a panoply of claims under both the ADA and Title VII. Defendant moves for summary judgment on all of the claims. The Court will first address the liability theories that Plaintiff has not seriously pursued, before turning to the issues that are genuinely disputed between the parties and in the record.

### A.  The Court Will Not Consider Theories Plaintiff Has Not Pursued

Plaintiff's Complaint asserts three theories of Title VII liability and three theories of ADA liability. (ECF 1, Compl. ¶¶ 25-38.) However, in Plaintiff's pretrial memorandum, he acknowledges that "[t]he gravamen of [his] claim is that he was subjected to [a] race-based and national origin-based hostile work environment that culminated with his constructive discharge." (ECF 22, Pl. Pretrial Mem. at 2.) Similarly, Plaintiff's opposition to KenCCID's Motion for Summary Judgment focuses exclusively on the national origin-based hostile work environment claim. In its response to Plaintiff's counter-statement of material and disputed facts, KenCCID asserts that Plaintiff "now proceeds only on his Title VII claim that he suffered discrimination in the form of a hostile work environment based on national origin." (ECF 27, Def. Resp. to Pl. Counterstatement of Material and Undisputed Facts at 1.) Because the briefing reveals that Plaintiff has chosen not to pursue Count II or the national origin-based retaliation theory on Count I, the Court considers whether summary judgment is appropriate only on Plaintiff's national origin-based discrimination and hostile work environment theories.

**B. Summary Judgment Will Be Granted On Plaintiff's National Origin-Based Discrimination Claim, and Denied on Plaintiff's Hostile Work Environment Claim**

Title VII of the Civil Rights Act of 1964 protects employees from discrimination by making it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff asserts two theories of liability under Title VII: (1) national origin-based discrimination and (2) a national origin-based hostile work environment.

**1. National Origin: Discrimination**

Discrimination claims brought under Title VII are analyzed under the three-part burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Therefore, the McDonnell Douglas paradigm governs Plaintiff's Title VII national origin discrimination claim. See Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (noting that the McDonnell Douglas framework applies to all claims brought under Title VII, even though "the prima facie elements of a discrimination claim vary depending on the particular facts of the case").

**a. McDonnell Douglas Framework**

First, under the McDonnell Douglas framework, the employee must establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden … of establishing a prima facie case."). The following elements comprise a prima facie case of discrimination: "(1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action

13

despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). Second, if the employee successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 802. Third, if the employer adequately articulates a nondiscriminatory rationale for its employment action, the burden shifts back to the employee to show that the employer's explanation is a mere pretext for discrimination. Id. at 804. Although the burden of production may shift during the McDonnell Douglas analysis, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the employee." Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005).

### a. Parties' Arguments

The parties dispute whether Plaintiff has adequately established the third element of his prima facie case—an adverse employment action. KenCCID argues that there was no constructive discharge, because at his deposition, Plaintiff "claimed that he quit … because he did not want to go to jail for striking Mr. Labitan with a shovel." (Def. Mot. for Summ. J. at 17.) According to KenCCID, Plaintiff's resignation is more accurately described as "an employee moving on with his career after his former coworker became his supervisor." (Id.) Plaintiff, by contrast, argues that he was constructively discharged in violation of Title VII because "after enduring an ongoing pattern of discriminatory treatment, and having his reports of [discrimination] result in no remedial action, he was stressed to the point of having no choice but to resign." (Pl. Opp'n at 7.)

### b. Application

Plaintiff's national origin-based discrimination claim fails at the first step of the <u>McDonnell Douglas</u> framework because he fails to demonstrate that KenCCID subjected him to an adverse employment action; that is, Plaintiff fails to demonstrate that he was subjected to a constructive discharge.[4]

A constructive discharge constitutes an adverse employment action under Title VII where the "working conditions become <u>so intolerable</u> that a reasonable person in the employee's position would have felt <u>compelled</u> to resign." <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 141 (2004) (emphasis added). The Supreme Court has identified two "basic elements" that comprise a claim of constructive discharge: first, that the plaintiff prove "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign;" and second, that the employee in fact resigned. <u>Green v. Brennan</u>, 136 S. Ct. 1769, 1777 (2016). There is no dispute that, as to the second element, Plaintiff resigned his position as Maintenance Coordinator, so the success of Plaintiff's constructive discharge theory turns on whether a reasonable person in his position would have felt compelled to resign.

Proper analysis of a claim of constructive discharge entails a review of the actions of both the employer and the employee. <u>See</u> <u>Goss v. Exxon Office Sys. Co.</u>, 747 F.2d 885, 888 (noting that constructive discharge requires that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign").

---

[4] Because Plaintiff cannot establish an adverse employment action, the other three elements of his <u>prima facie</u> case of discrimination under Step One of the <u>McDonnell Douglas</u> framework will not be analyzed, and the Court will not reach the arguments on Step Two and Step Three of the <u>McDonnell Douglas</u> analysis.

As to the actions of the employer, the Third Circuit has explicated various employer actions that are commonly claimed by employees who have been constructively discharged. Those actions include threats to the employee to resign; suggestion or request that the employee resign or retire; demotion or reduction in pay or benefits; transfer of the employee against his wishes to a less desirable position; alteration of the employee's job responsibilities; or conferral of unsatisfactory job evaluations. Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993); see also id. (collecting cases discussing constructive discharge in the context of the Clowes actions). Where none of these actions are present, courts have found that no constructive discharge occurred. See, e.g., Gunn v. On The Border Acquisitions, LLC, 298 F. Supp. 3d 811, 824 (E.D. Pa. 2018) (Stengel, J.) (finding plaintiff was not constructively discharged, and employer was entitled to summary judgment, in part because "[n]one of the factors discussed in [Clowes] … [were] present"); Seeney v. Elwyn, Inc., No. 08-5032, 2010 WL 1657185, at *5 (E.D. Pa. Apr. 22, 2010) (Robreno, J.) (holding that because plaintiff did not establish that her employer took any of the Clowes actions, "a reasonable jury could not conclude that the conditions [she] faced … were so intolerable that a reasonable employee facing the same conditions would leave the job"). However, absence of the Clowes actions is not necessarily dispositive. See Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 168 (3d Cir. 2001) ("[I]t is important to note that we have never made the Clowes factors an absolute requirement for recovery.").

As to the actions of the employee, the Third Circuit has noted that where an employee does not attempt to work with the employer to identify alternate relief, a claim of constructive discharge may be lacking. See, e.g., Clowes, 991 F.2d at 1161 ("It is also highly significant that [plaintiff], prior to leaving her position" did not attempt to identify a solution with her employer). The Third Circuit has explicitly noted that "a reasonable employee will usually explore … alternative avenues

thoroughly before coming to the conclusion that resignation is the only option." Clegg v. Falcon Plastics, Inc., 174 F. App'x 18, 27 (3d Cir. 2006) (quoting Clowes, 991 F.3d at 1161). Such alternative avenues may include requesting or acquiescing to internal transfer, advising the employer that the employee feels compelled to leave if changes are not made, and pursuing remedial procedures available through the human resources department. Id.

The facts in the record do not support Plaintiff's claim that the working environment at KenCCID was so unbearable that resignation was his only choice, so he fails to establish he was subjected to a constructive discharge. As to KenCCID's involvement in Plaintiff's resignation, Plaintiff has not established that KenCCID took any of the Clowes actions. There is simply no evidence in the record indicating that KenCCID ever threatened Plaintiff to cajole him into resigning; directly suggested resignation; demoted or otherwise reduced his pay or benefits; transferred him elsewhere within the company; changed his work responsibilities; or gave him unsatisfactory performance reviews. Although the absence of a Clowes action is not automatically dispositive, Plaintiff's own actions also support the conclusion that no constructive discharge occurred. While Plaintiff explained in his deposition that he communicated with the KenCCID management team regularly about his disagreements with Labitan, there is no evidence indicating that Plaintiff attempted to work with KenCCID to explore an alternate avenue for relief or advised management of his intent to resign if the tension did not abate.

Plaintiff cites Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996) in support of his position that his resignation was not voluntarily, but rather was a constructive discharge. (Pl. Opp'n at 7.) Aman involved allegations of a continuous pattern of race discrimination over a period of six years; specifically, allegations that the plaintiff and other African American employees were referred to as "another one," "one of them," and "poor people;" were falsely

accused of receiving favoritism from an African American supervisor; were ignored, even when requesting information that was necessary to competently complete a job; and were forced to do menial tasks such as running personal errands. Aman, 85 F.3d at 1078-79. This record was sufficient to establish the "continuous discrimination [that] could support a conclusion that [the employee] simply had had enough," and therefore entitled the plaintiff to survive summary judgment. Id. at 1084.

Plaintiff advances a theory of constructive discharge similar to that advanced in Aman—that he was subjected to a pattern of discriminatory conduct. However, the similarities between this case and Aman do not surpass the theoretical, because Plaintiff's allegations fall short of the "intolerable conditions" threshold that was satisfied in Aman. Unlike the plaintiff in Aman, who was forced to endure not only disparaging racial remarks, but also was ignored and disrespected by coworkers, was subjected to false accusations of favoritism, and was ordered to complete tedious tasks, here the record reveals that Plaintiff was subjected to discriminatory comments made by one employee. Moreover, although Labitan's discriminatory remarks are documented in the record of Plaintiff's deposition, scrutiny of the record as a whole reveals that many of Plaintiff's complaints focused on the work-related disputes he experienced with Labitan. See Pl. Dep. 108:4-25; 109:1-8; Warrakah-Ali Dep. 13:24; 14:1-21; Sivieri Dep. 12:9-16. Allowing Plaintiff to proceed on his national origin-based discrimination claim with a record that lacks evidence supporting an adverse employment action would contravene the Third Circuit's instruction that "discrimination laws '[should not] be transformed into a palliative for every workplace grievance, real or imagined.'" Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)).

In sum, the actions Plaintiff describes were "certainly stressful and frustrating," but a reasonable person in his position would not have felt compelled to resign based on the events that occurred at KenCCID. Duffy, 265 F.3d at 169. Therefore, Plaintiff fails to establish that a constructive discharge occurred, and he cannot establish a prima facie case of national origin-based discrimination. As a result, KenCCID is entitled to summary judgment on this theory of Title VII liability.

### 2. National Origin: Hostile Work Environment[5]

The Supreme Court has recognized that the prohibition encompassed by Title VII is not limited to specific employment decisions. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 ("[Title VII] covers more than terms and conditions in the narrow contractual sense.") (internal quotation marks omitted). Rather, discrimination within the scope of Title VII's proscription also occurs if the "workplace is permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and if the conduct is based on a Title VII-protected category. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted). This type of claim—a Title VII hostile work environment claim—requires that: "(1) the employee suffered intentional discrimination because of his/her [protected category], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) [a basis for] respondeat superior liability [exists]." In re Tribune Media

---

[5] Since "there can be no legitimate justification for a hostile work environment," the Third Circuit has noted that these claims are not subject to the McDonnell Douglas framework. Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 213 n.11 (3d Cir. 2017). Therefore, the Court analyzes Plaintiff's hostile work environment theory separately.

_Co._, 902 F.3d 384, 399 (3d Cir. 2018) (quoting Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017)).

The analysis of a hostile work environment claim necessarily requires "looking at all the circumstances, [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Supreme Court and the Third Circuit have both cautioned that "simple teasing, offhand comments, and nonserious isolated incidents" will not "amount to discriminatory changes in the terms and conditions of employment." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 280 (3d Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

### a. Parties' Arguments

KenCCID argues that Plaintiff's hostile work environment claim must fail because (1) Plaintiff was not subjectively affected by the remarks, nor did the remarks negatively impact Plaintiff's ability to perform his job; and because (2) Plaintiff has not established a basis for employer liability. (Def. Mot. for Summ. J. at 2.) Plaintiff responds that because he "testified in detail about the nature of the comments he was subjected to by Mr. Labitan," and because the deposition testimony of Sivieri "partially corroborate[s]" his theory that KenCCID knew about Labitan's harassment, a genuine dispute of material fact exists and precludes summary judgment. (Pl. Opp'n at 3.)

### b. Application

Plaintiff has produced sufficient evidence to permit a reasonable jury to conclude that "discriminatory intimidation, ridicule, and insult" pervaded Plaintiff's working environment at KenCCID. Harris, 510 U.S. at 21.

As to the first element—intentional national origin-based discrimination—the Court concludes that Plaintiff has adequately shown Labitan intended for his comments to disparage Plaintiff's national origin. There is a dispute in the record as to whether Labitan made the comments that Plaintiff complains of. Plaintiff recited specific comments Labitan allegedly made (e.g., African American people are "lazy;" and rely on "welfare"), but Labitan specifically denied making each of these comments. Although Sivieri could not recall specific racially derogatory comments that Plaintiff reported to him, he confirmed that Plaintiff reported he generally felt harassed by his Maintenance department coworkers.

Assuming that Plaintiff's version of events, which is arguably supported by the testimony of Sivieri, is correct, Labitan's comments specifically criticizing "black" and "African American" people were undoubtedly intended to disparage Plaintiff on the basis of his national origin. Cf. Nott v. Reading Hosp. & Med. Ctr., No. 11-2265, 2012 WL 848245, at *10 (E.D. Pa. Mar. 14, 2012) (Surrick, J.) (determining generic comments that did not single plaintiff out based on religion left "no reasonable basis on which to support an inference that the … offhanded and isolated comments … [were] motivated by anti-Jewish sentiment"). Plaintiff is entitled to survive summary judgment if there is a genuine dispute of material fact, and the divergence between the testimony of Labitan, on the one hand, and Plaintiff and Sivieri, on the other, regarding whether Labitan made national origin-charged discriminatory remarks establishes a genuine dispute. See Webb v. Merck & Co., Inc., 450 F. Supp. 2d 582, 598 (E.D. Pa. 2006) (Yohn, J.) (permitting plaintiff to survive summary judgment where the record demonstrated that his supervisor referred to plaintiff as an animal and the supervisor referred to himself as a zookeeper).

As to the second element—discrimination that was pervasive—the Court is satisfied the record contains evidence that would support a jury finding of the requisite severity. The reference

for the severe and pervasiveness inquiry is the entirety of the events and comments that occurred. See Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) ("In determining whether the conduct at issue is sufficiently extreme, we consider the totality of the circumstances."); Abramson, 260 F.3d at 279 ("No one event alone stands out from the rest, but all of the events could be found to aggregate to create [a] [hostile] environment."). Here, Labitan started in the Maintenance department in 2014, and, according to Plaintiff, the national origin-based statements started almost immediately. Plaintiff also testified that Labitan "always" commented on his perception that African American people are lazy. (Pl. Dep. 77:12.) Therefore, according to Plaintiff, he was forced to endure Labitan's discriminatory remarks, which were made with regularity, for three years.[6]

Considering the "overall scenario" of Plaintiff's experience in the Maintenance department, Plaintiff has sufficiently established the pervasive element of a hostile work environment claim. Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). Plaintiff has adduced evidence adequate to create a factual dispute as to whether the discriminatory remarks that Labitan allegedly made criticizing the work ethic and accomplishments of African Americans over the three-year period when Labitan was in the Maintenance department were severe and pervasive. Compare Hargrave v. Cty. of Atl., 262 F. Supp. 2d 393, 422 (D.N.J. 2003) (finding evidence that plaintiff, an African American, was referred to as "you people" over a period of years prohibited the court from "conclud[ing], as a matter of law, that no reasonable African American employee would consider the comments and conduct … 'severe' enough to create an objectively hostile or abusive working environment"), with Ballard-Carter v. Vanguard Grp., 703 F. App'x

---

[6] Plaintiff's inability to recall specific dates and locations of the discriminatory incidents is not dispositive, because he alleges that the comments were made regularly. See Koschoff v. Henderson, 109 F. Supp. 2d 332, 348 (E.D. Pa. 2000) (Van Antwerpen, J.) ("While the evidence does not reflect specific dates for the incidents which harassed [p]laintiff, it is clear that they were frequently day-to-day, ongoing events.").

149, 152 (3d Cir. 2017) (finding four comments that "[a]t best … may be considered uncivil" were not "so severe as to alter the conditions of [plaintiff's] employment" nor frequent enough to "be considered pervasive"), and Clair v. Agusta Aerospace Corp., 592 F. Supp. 2d 812, 822 (E.D. Pa. 2009) (Robreno, J.) (finding that five vague statements that did not "necessarily evidence a clear discriminatory intent" and were isolated over a twenty-one month span did not establish severe and pervasive discrimination). The repeated harassment Plaintiff complains of is more than a "mere utterance of an ethnic or racial epithet" that is insufficient to trigger Title VII, and Plaintiff has adequately made out a genuine dispute on the severe and pervasive element of his hostile work environment claim. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

As to the third element—the actual effect of Labitan's comments on Plaintiff—it is evident that Plaintiff was personally and detrimentally affected by the workplace harassment he alleges. In his deposition, Plaintiff explained that Labitan's criticisms of African American people deeply offended him because he is "a proud black, honest payer, voting, hard-working black American with a clean record." (Pl. Dep. 81:7-8.) Plaintiff also expressed that he felt Labitan's comments were "downgrading [his] country." (Id. 82:8.) He explained that Labitan's comments and the general dysfunction in the department enraged him to the point where he was concerned about his ability to control his actions and feared he might be unable to stop himself from resorting to violence. Contrary to Defendant's contention, this drastic behavioral change in disposition is sufficient to establish the subjective effect that Labitan's comments had on Plaintiff. See Koschoff, 109 F. Supp. 2d at 348 (finding that plaintiff whose disposition changed from cheery to sullen and who exhibited crying outbursts supported a subjective effect).

As to the fourth element—the effect that Labitan's comments would have had on a reasonable person in Plaintiff's position—there is a triable jury issue as to whether Labitan's

conduct was objectively offensive. This element asks "the finder of fact [to] actually determine whether the work environment [was] … hostile." <u>Andrews</u>, 895 F.2d at 1483. An example of a situation where it may not be reasonable for a finder of fact to find a claim of harassment offensive is if the plaintiff is "hypersensitive." <u>Clair</u>, 592 F. Supp. 2d at 823. Viewing the disputed facts in the light most favorable to Plaintiff, as the Court is obligated to do at this stage of the litigation, Plaintiff has adequately shown that a reasonable person could have been negatively impacted by the comments made by Labitan, and that Plaintiff's perception was not distorted by an overly sensitive or delicate disposition.

As to the fifth element—<u>respondeat superior</u> ("vicarious") liability—the exposure of the employer turns on the role that the harasser occupied in the employer's hierarchy. According to the Supreme Court, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." <u>Vance v. Ball State Univ.</u>, 570 U.S. 421, 424 (2013). By contrast, if the harassing employee is the complainant's supervisor, and the harassment culminates in a tangible employment action, strict liability attaches. <u>Id.</u> If the harassing employee is the complainant's supervisor, but the employer does not take a tangible employment action, then the employer may raise, as an affirmative defense, that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." <u>Id.</u>

In this case, Plaintiff alleges that Labitan made disparaging remarks while they were coworkers in the Maintenance department, and that these remarks continued after Labitan was promoted to Maintenance Supervisor in January 2017. Therefore, as to the comments made prior to Labitan's promotion, KenCCID is only liable if it was negligent in controlling the working

24

conditions in the Maintenance department. As to the comments made after Labitan's promotion, the applicable rule turns on the definition of who qualifies as a "supervisor." According to the Supreme Court, a "supervisor" for purposes of Title VII vicarious liability is one who "is empowered by the employer to take tangible employment actions against the victim." Id.

Applying this definition to the Maintenance Supervisor position as described by Warrakah-Ali, there is a genuine dispute of fact regarding whether the KenCCID Maintenance Supervisor was a "supervisor" under the Supreme Court's formulation. Warrakah-Ali explained that the purpose of the Maintenance Supervisor position was to resolve disputes, distribute assignments fairly, and complete specialized jobs, and that one of the members of the executive team retained ultimate responsibility for the oversight of the department. (Warrakah-Ali Decl. ¶ 17.) Although Labitan, as Maintenance Supervisor, did not have the authority to "hire, fire, demote, promote, transfer, or discipline," he did have the authority to direct Plaintiff's day-to-day actions and refer disciplinary issues to his superior, so there is a genuine dispute as to whether he was a supervisor for purposes of the hostile work environment analysis. Vance, 570 U.S. at 425. Nonetheless, because it is more difficult to establish liability under the nonsupervisor rule—according to which an employer is liable only if they are negligent in controlling working conditions—the Court will apply that rule to analyze the respondeat superior element as to comments made both before and after Labitan's promotion.

Plaintiff has established a genuine dispute as to whether KenCCID was negligent in failing to control the working conditions of the Maintenance department. The discovery evidence is undisputed that Plaintiff brought the tension between him and Labitan to the attention of KenCCID management. Although the record is murky on whether Plaintiff notified management specifically about Labitan's discriminatory remarks, Plaintiff maintains that he brought this mistreatment to

the attention of his supervisors, and Sivieri's testimony arguably confirms his recollection. This is further supported by Warrakah-Ali's acknowledgement in an email that the harassment allegations Plaintiff made against Philips and Labitan were "serious accusations." (Sivieri Dep. Ex. P-1.)

There is also evidence in the record that management periodically held meetings with the Maintenance department to discuss work-related problems involving the department. However, there is no indication that Plaintiff's claims were investigated, followed up on, or documented. For example, there is no indication in the record that management sought out Labitan individually to advise him of the impropriety of his behavior, or questioned other individuals employed by the Maintenance department to confirm Plaintiff's version of events. Cf. Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 683 (E.D. Pa. 2016) (Stengel, J.) (finding that because employer thoroughly investigated allegations of harassment, there was no basis for vicarious liability, even though investigation was lengthy); Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 654 (E.D. Pa. 2012) (Joyner, J.) (finding no basis for vicarious liability where the employer took appropriate remedial action designed to prevent future harassment). Because there is evidence indicating that KenCCID knew about Plaintiff's allegations of national origin-based harassment, and because there is no evidence that KenCCID took any meaningful action to address Labitan's behavior, Plaintiff has established a factual dispute regarding KenCCID's liability that entitles him to survive Defendant's motion on the hostile work environment Title VII theory.

## VI.    CONCLUSION

Viewing the record in the light most favorable to Plaintiff, the Court concludes that Plaintiff has identified facts from which a reasonable jury could conclude that KenCCID subjected him to a hostile work environment based on his national origin in violation of Title VII. Defendant's

Motion for Summary Judgment is therefore denied as to this claim but granted as to the other theories of liability that Plaintiff asserts.

O:\CIVIL 18\18-2869 Mitchell v Kensington Community Corp\18cv2869 Memorandum re Defendant's Motion for Summary Judgment.docx